Mr. Asbury, you may approach. I think you were in the courtroom earlier when I explained that I am a partially blind justice today, but that's maybe a good thing. So if I'm making funny faces at you, it's just because I'm not bewildered, but I'm trying to adjust to Okay, all right. So with my apologies in advance, and hopefully you haven't started this time until he utters his first word. You may proceed. Your honors, may it please the court, distinguished counsel. I am attorney Derek Asbury, as the clerk noted, representing the appellant in this case, A.J. Cummings, who was the husband in a divorce in Peoria County. You are familiar with the briefs, you're familiar with the facts. I will go right into, this late hour, the issues of the case. There are three that were filed by the appellant. The first is whether the trial court's disproportionate distribution of the marital assets and debts in favor of the wife was an abuse of discretion. On that issue, I would point out to the court in the court's judgment and ruling, reliance upon a position paper as well as an exhibit that the court summarily adopted that outlined what he believed was a 54-46% distribution. Now you must remember in this case, at this juncture at the trial, which I think occurred over a couple of days, she was represented by counsel, he was pro se. This exhibit, if you look at it, and the problem here is that an appellee cites in his brief a number of cases that this percentage is okay, if it's one with 60-40. The problem you have here is that when the judge issued this judgment and in the trial record stated he believed it was actually a 54-46% distribution. If you look at the exhibit that was relied upon to come up with this figure, it's inaccurate. A cursory review of that exhibit will show that not only is it inaccurate mathematically, it's misleading. When you look at the ledgers and the categories of what's awarded to one party or the other, there's portions where she's awarded I think it was $106,000 and it's one of the accounts of the IRAs. When you look at the ledger of how they total it, that is not even put in her column as an asset. This isn't a case of... Is that one of the accounts though that was dissipated to pay ongoing bills? There was a number of accounts that were dissipated to pay ongoing bills, but I think if you look at the ledger... That's why it wasn't there because it was gone once the court allocated the marital assets. But if you look at, I think if you look, and I agree with the court, there are some issues of dissipation. This wasn't dissipation, this was just they had to spend that money to maintain the marital assets, the home and the household and feed the children because his income was low and hers was nonexistent because of the number of children. I think some of the accounts... And there was a failure to pay the temporary support as well that was ongoing and so if I recall the record correctly, the court dragged everybody in and said, okay, I have to order that you guys liquidate this account. Maybe I'm wrong and counsel can correct me later. So that's why that asset wasn't there. In the ledger, the account that was lowered, it says in her ledger, and this is a different account, this isn't the 106,000, this is one that was, the one you're referring to I think was 258 and then I believe was reduced and it shows in the column what it was reduced for and it puts in parentheticals what was paid. I promise I'll check the record carefully. Okay. But in any event, the one I was referring to was one that just didn't make it over in the column. I think the account you're referring to did in fact acknowledge on the ledger that it was reduced and the amount was 156, although we're arguing that full 258, because of the 156 reduction, some of that money was used for her own attorney's fees, things awarded to her, which in the ultimate judgment I think the court awarded each party to pay their own attorney's fees. The problem is when you look at it and you actually start doing the mathematics involved in this position paper and the court's belief that this was a 54, 46% split is that it goes even further I think, not only on the position paper being misleading, inaccurate, and frankly very difficult to follow, but that there are a number of things that weren't accounted for. In the hearing, Mr. Cummings presented a long list of marital items. They were entered into evidence. He provided some testimony for it and I think the court just sort of ignored that, whether it was because of being pro se or for whatever reason. It wasn't considered a through. And I would submit to the court that when you look at the judgment that awarded her everything that was in the marital home, and we're talking about a very large marital home, you saw the figure, it was a $700,000 or $800,000 home, that was acquired while he was working as an ER doctor for a significant period of time, that wasn't outlined in the few big There's a substantial award that's not even considered by the court, a substantial award that's not even given value, even though at the trial level, although unrepresented, he presented this exhibit, testified to it, there was no objection. I feel as if in the judgment it was just disregarded, not considered. Finally, the other two awards that were given to my client that were part of the determination of this being a 54-46 split was the gold, I believe it was diamonds or silver. I believe it was diamonds. And I would argue that there was very little evidence presented on this that his, it's really a phantom award, because at the time, at the trial... Who had custody of those items? Presumably, I mean, they were in the home. I think the testimony was he had them in the home, and then at some point he was removed by order of protection. And when he left, I believe he was allowed and escorted with law enforcement to remove those personal effects on him. After he was removed from the home, he was not, I don't believe, allowed access back to the home. So our position would be, obviously, it would be the police by virtue of possession of the home. Moving on to the next issue, if I may. But I thought that he was able to retrieve those items, the gold, the diamonds, some of the Civil War memorabilia and those other things, that he was able to retrieve those. But you're saying that no, he didn't? No. That was, in the judgment, he was awarded certain things that would take effect post-judgment. The record, I believe, shows that, Your Honor, that when the OP entered, he was allowed access a day or two with law enforcement to remove certain items. His testimony at trial was, I didn't remove any gold. I'm not in possession of it. So as far as definite, finite assets that the court was determining are real, are acknowledged by the parties, are in existence, he didn't get really any of them. He only got the gold, I would argue, somewhat phantom assets that were not really certifiable in existence or in his possession. The next issue, if I may, Your Honor, is a little more complicated. It's whether the trial court's imputation of the husband for setting support and maintenance was proper. I would argue that the court, in this case, I mean, it's a two-step process. The first is manifest weight of the evidence. And that is, considering the facts of the case, was this a voluntary or involuntary termination of employment? Did he resign, or did he quit? I would first argue that, in this case, although he resigned, it would fall a little more under the latter, or the former, and that is that this was more of a termination. You have an ER doctor who is in the middle of this highly contested divorce. You've seen the record. You have numerous pleadings, sworn pleadings, coming from the appellee that want to restrict visitation, that wants custody, that says he's unsafe around children, he's not mentally stable. These are sworn pleadings. And this is at the visitation custody side. Now we move forward to the financial side, and he presented a doctor who testified in court that he's been a treating physician for 14 years. He suffers from these conditions, post-traumatic, outlines a bunch of anxiety, mental instability, which corroborates what the appellee says at an earlier juncture in the trial. But she's not an expert. She's his soon-to-be ex-wife. Oh, that's true. So who was his expert that verified that he has post-traumatic stress disorder? He presented, I forget the doctor's name, but it was his treating physician for 14 years. It's the doctor that prescribed him the medication to make the diagnosis. At trial, I guess, there was nothing presented to contradict this. No doctors or testimony coming from the appellee. It was simply the belief that that doctor wasn't complicit with my client like he's a friend or a buddy. The testimony was he had treated him for 14 years. I think we can infer there may have been some friend-acquaintance relationship. But I think the court cites his complicity with the testimony of my client, A.J. Cummings, as the basis for not accepting that testimony or not finding it credible. The problem is the court's almost laconic when you look at it as to what testimony he's referring to. And when you look at the testimony and you look at the record, which is very important on this issue, it would seem to me, he's basing it on a cross-examination by counsel, that it appears to be him knowing the background of the case, him knowing having problems with his wife, him knowing having potentially supervised restricted visitations. If you're a treating doctor, I would argue that it would almost, particularly for these conditions, if you don't make inquiry into this, patient history, what's bothering you, why are you stressed out, why are you having trouble sleeping, if you don't make inquiry into these areas, that would almost be malpractice. It would be like going in and having a broken leg and telling the doctor, well, the doctor not asking you, why is your leg broke, what happened? It's the same circumstances. But that patient history that the doctor was able to relate to these facts is now being used against him as a basis of not being credible. The other thing that I would point to the court is the disability policy. This is not a non-profit insurance policy he has that's giving him $10,000 a month after taxes. He went through, I say it was a non-profit. I mean, it's a private insurance company, and the point of that is that he was approved for a very significant amount about a company, I would imagine, that does business to make money. They're not just handing out $10,000 policies. You don't just call them up and say, well, I'm... I'm sorry, I just don't understand. What's the reference to non-profit? It was referencing that this is, it was more difficult, I mean, there's a process involved. They're a profit organization whose, the bottom line is ultimately what a corporation is trying to make money for profit. They're not going to hand out $10,000 without some process of screening to ensure that the individual is actually, fits the policy. So in summation on that issue, and I will concede and it will be argued about how my client, you know, was a smart aleck, would sometimes come late. You know, there are things he did. But reason, following the statute, applying the law, and really simple arithmetic are all things that have to be followed. If there are processes and procedures for contempt, I think we have to be careful and not blur the two and simply just accept a document presented by another attorney that is completely inaccurate. The final issue, Your Honor, and three, I mean, it may be somewhat moved, but I think it's important and I still raised it, because it goes to the internal inconsistencies of the judgment. Counsel, that's two minutes. And that is whether the court's self-executing order that proportionally raises maintenance as child support decreases and the minors are emancipated with abuse of discretion. There is no case law on this subject because I think it's so clear in the statute that there is a procedure involved and that there has to be a hearing. There are relevant factors the court has to consider. His brief presents no cases, nor do mine. This would be a case of first impression where the court would adopt basically obliterating what the statute says and, you know, creating new law here today. Even though it – What's the event that triggers the reduction in – the increase in maintenance? Emancipation of minors. Which minor? Any of them. It doesn't say. I don't think the order says that. It says the youngest. So that won't occur until 2023, if I recall correctly, and I'm basing it on my memory instead of being able to read the brief right now. Sure. But I'm wondering if this issue is simply not right for our review until that event occurs. If the court – and I don't – to be honest with you, I don't recall either – if the court is correct, then rightness would be a consideration. It sounds like the maintenance will not automatically increase until the youngest child graduates or some other event. So I'm concerned about the rightness issue if you haven't really thought about it and want to – I could be mistaken, but I thought that it was to be a stair step as each child gets older. Maintenance would go up, so maintenance would – child support would always add up to $12,000. Okay, I'll review the court's order and see if that construction is permissible. But later in the judgment there is a provision, and this is the inconsistency, which acknowledges – I wouldn't say explicitly acknowledges, but is in contradiction, and I think added by the judge – that there will be a two-year review, which then comports with the statute. But the point is, is the judge executed a sign of ratified – Of maintenance, of maintenance, correct? Two years' review of maintenance. Review of maintenance, so there wouldn't be an automatic provision circumventing the statute. But my point is, is that when you have those conspicuous contradictions within a judgment that's only five, six, seven pages long, it calls into question on the basis of discretion, how carefully was this reviewed? This was signed, ratified, and endorsed, and I have the utmost respect for Judge Galley. I think this is uncharacteristic, but it calls into question how carefully this was reviewed or whether this was a case where it was just put in and signed off, because those are conspicuous and obvious. They're not subtle. They're not hidden. And the mathematics – you know, we didn't hire Price Waterhouse to come in and come up with a one or two percent difference. These are blatantly obvious. So the combination of those, I would ask that the three of those issues, notwithstanding the issue of rightness, which would depend on the record and the order, but that the decision be reversed and remanded for a new trial so a more thorough analysis can be performed by the court on the record and actually identifying the distribution rather than just acceptance of an inconsistent ledger sheet, I suppose, of the assets and debts. Thank you. Thank you. Let me put my glasses on here so I can call you by name, Mr. Murphy. I apologize. It's heck getting old. Good morning. My name is Ed Murphy, and I'm here on behalf of the appellee, Julie Cummings. Unlike Mr. Asbury, I've been in the case for four and a half years, and so where I think we can differ is Derek came in the case at the end. In fact, he entered his appearance 11 days before we did the final trial. Mr. Asbury and I finished the case, and he came in the case 11 days before the final hearing after four days of partial days of trial. So this trial went on for four days without Mr. Asbury being in the case, and then the fifth day of trial, finishing the case, he was officially his attorney, but he was not able to be there for the trial. The court denied a motion to continue by Mr. Cummings that day, and we finished the case that day. So officially he did have trial, but I will agree with Mr. Asbury, he wasn't there that day, and Dr. Cummings essentially finished the case himself. There is a huge dispute, though, in regard to what we're really doing here, because I think if you look at the facts of the case, and you guys have all read the briefs, and it looks to me as if this really was not a hard case to start with. It was made a hard case because of the actions of the parties. Dr. Cummings went through six attorneys, and the case took four and a half years because we continually had new attorneys, every single issue was litigated. The facts aren't that difficult. It really was a maintenance case. If you take the case at the beginning, it's a 24-year marriage. Julie Cummings is a stay-at-home wife and mother of six children, now age 17 to 7, and Dr. Cummings was an emergency room doctor and professor at OSF, and I think the U of I School of Medicine. He taught other ER doctors. And there's no dispute factually. If you look at the three documents that Mr. Asbury is referring to, the position paper we filed as our request for the court for the relief, the Exhibit A, which is the overall property distribution, and Exhibit B, which is the child support and maintenance chart, the underlying facts of those documents were not objected to except for one appraisal. Dr. Cummings did object to an appraisal on part of the Ivy Lake Road property, and that was thrown out. It was not accepted by Judge Galli. The rest of the evidence, all of the tax returns, paycheck stubs, all of the underlying supporting documents as to the values of all the assets and debts, none of those were disputed. And one thing I will pride ourselves on, what we did, is we tried to present a mass amount of information to the judge in a usable format, and that's what Exhibit A and B did. It gave the court an Excel chart summarizing all of the assets and debts and put them into a usable format. There are two columns for what we were requesting Julie Cummings receive and what we're requesting Dr. Cummings receive. So if you look at the first issue, the disproportionate share of property, one of Mr. Asbury's main complaints is a factual issue. He's claiming even today that $106,000 isn't on the chart I presented to the judge. But it is. And Justice Wright, you're correct. That $106,000 was cashed in. That was a specific Smith-Barney account that is on the chart in two separate places, essentially. The $106,000 was cashed in to pay the mortgage, back child support, back maintenance, different bills, a GAL attorney's fees, and attorney's fees to the attorneys at the time. So that $106,000 was essentially liquidated because Dr. Cummings wasn't complying with court orders for a period of several months, not just a week or two. And the judge didn't do that until after there had been a rule to show costs because Dr. Cummings was not paying temporary support. Correct. And so at that point, I mean, the court had tried to compel him to pay support. Yes. And was left without. This was a family that needed to feed its children. Correct. And I think that's the pattern you're going to see ultimately even throughout the last couple years of the case, but even in the ruling. If you look at Exhibit A, which is the property distribution, the way it's set up is because the only way we could get things paid for, there's a huge amount of debt, was to cash in assets. And the only way to guarantee those being paid was to give the assets and the debt to Julie Cummings because the court wasn't confident, and we weren't either when we made the argument, that Dr. Cummings would pay any bills. Wasn't there another account of $50,000 or so later on that the court liquidated? Yes. I'm pretty sure. I was thinking it was $36,000 was the net. It might have been $50,000 gross. We ended up with about $36,000 net. That was also used to pay bills secondarily. And wasn't that amount then divided equally in terms of the distribution? I mean, it's not like Mr. Cummings had to support the family alone. Half of that was given to him and half of it was attributed to her? I will say yes, that's true, but probably not in reality. It was on paper. The reality was ultimately all the money didn't go to Dr. Cummings because he wasted it and didn't have any expenses going on. He was living in their Ivy Lake property with no running water. I mean, he fell from making $386,000 a year to living in a barn with no electricity, with basically refusing to go get a place to live, refusing to get a job, refusing to do anything the court told him. Did that occur after he resigned? Yes. He was in the barn before then, but as far as the money issues of cashing things in occurred after that. So from a property standpoint, one main issue I would like to address is really just to clarify the facts to make sure, because I think that's really what this case is. Mr. Esmer and I both supply cases. I don't think the law is in dispute on either issue of the disproportionate property, the cases that apply, or the imputed income. We all cite cases, and this is really a fact-based question. I would point out to the court today, I think, that this is not against the manifest way to the evidence, and Judge Galley specifically found that A.J. was not credible multiple times. He found him content multiple times. There's multiple references throughout where A.J. Cummings specifically told the judge, I'm not going to do what you ordered me to do. He flat-out told him between February of 2012 and May when we had the final hand that he was not going to go get a job as an emergency room doctor, and he was not going to leave the Peoria area, even though we had filed a motion to have him accept a job in Macomb, where he could potentially have made $296,000. He flat-out in court said no. He was offered that position at Macomb, correct? Initially. And he said, well, if they knew how sick I was, they wouldn't give me the job or I would lose the job. Isn't it relative to both the imputation of income and the maintenance that the judge found that he wasn't credible, that he could have had this job, and it was a voluntary reduction in income to the $10,000 net, to the disability payment, therefore he was still going to be responsible for the $13,000 a month that the judge felt he should have been paying? Yes. I think that answers both questions. On the imputing income, he made a finding that not only, if you look at the case law about the three different options, but he made a finding that he voluntarily terminated his employment. He made a finding that he turned down this other job so that there was other income available to substitute it, and he was voluntarily not going to take that job, which he unreasonably failed to take advantage of that employment opportunity, that this was all an attempt to evade child support maintenance. And again, it goes back to the credibility of Dr. Cummings. The property, though, there are a couple things I will point out. My chart literally goes through line by line, asset by asset, and the other thing that Mr. Asbury referred to today was there was an account with $256,000 that we had down at $178,000 approximately. That's true. There were two retirement accounts that were defined contribution plans, IRAs or 401Ks, and we asked the court for Julie to receive those so that she could cash them in and pay this massive amount of debt that had been incurred over the last four years. So that's what the court adopted. So when we did that, we put the reduced amount, we put $0.65 on the dollar, because she was going to have to pay taxes and penalties to cash them in. The same as there are calculations in the chart on Exhibit A about the $106,000 that was cashed in. There are taxes that were still going to have to be paid out of that because they didn't pay enough taxes when it was cashed in. The parties, in fact, didn't even file taxes the last two years. That was part of the ruling that they would file taxes and get that paid. So I think the statement in Mr. Asbury's brief that this is illogical, inaccurate, misleading is completely incorrect. We spent a lot of time trying to simplify it so the judge could make a ruling because that was part of the problem. As this court is aware, a case with a pro se defendant is harder than a case with... I wish Mr. Asbury had been there the whole time because it would have been easier to present the case. Can you address the phantom asset issue that Mr. Asbury raised? Yeah, I'm not sure exactly what he talks about. If we take the phantom asset being the gold and the diamonds, I think that's the best answer for phantom asset. I think that goes back to credibility. The court, we put in evidence the receipts that show that they had purchased the gold and the diamonds. So there's $100,000 worth of diamonds and $60,000 worth of gold, and we have that in evidence undisputed. We had a valuation by using the current values. We went online, went to Monex and a couple of the other online valuation services and said, okay, if you own XYZ ounces worth of gold at this amount, it's worth this. The only issue was who had it. AJ came into court and said, I don't have it, and Julie testified that he did, that it was at the house, and when they lived there together, and then after he had left, it was gone. And the court made a specific finding that the court found Julie to be more credible than AJ, and so by me putting that on his side of the ledger, that was consistent with the court making a finding that they agreed with our evidence, that AJ took it. It was also consistent, if you think about it, with our argument during court that AJ had no verifiable income after September of 2011 until the end of the case. Yet every month he was paying bills. He had a 2006 Mercedes that had a $15,000 debt. Every month he was paying, you know, $800, $900 a month on his car payment. He was, by the end of the case, he was living in this barn. There was bills. He was putting improvements. He bought a solar system. He put in running water. He put in things that all cost money, and he had no money. He was coming into court on one hand saying, I am penniless, I'm living in this barn with nothing, and she has all the assets, but then he's going out buying all these things with no verifiable income. We presented to the court, it was our position, that that was consistent with the fact that he had all the gold and the diamonds, and he was catching those in. That's how he was supporting himself, because he didn't get the $10,000 disability until February of 2012. So there was about a five or six month period that he literally had no income after he resigned his job. So overall, those are the kind of phantom things. The other thing is, like Mr. Asbury argued, that we put $53,000 on, you know, that $106,000 that we added as a $53,000 a month. Again, I think that's just Mr. Asbury not understanding completely the chart of how it worked. That $106,000 was an asset. If it hadn't been cashed in, Judge McCoy previously had ruled, okay, we're going to split that in half. Otherwise, she'd be paying herself with her own money. So we put that $53,000 back in and say, look, we spent the $106,000 because AJ didn't pay his bills, so that's gone, but she still would have got $53,000. So the court was basically attributing the $106,000 off the sheet and saying, look, because of his failure to comply with orders, she lost $53,000 of assets. So the $106,000 isn't in the chart as a number, but the $53,000 is, that that would have been owed back to her. So those are the kind of phantom assets. They refer to the College Illinois funds, and he complained in his brief that I didn't put the College Illinois funds in my chart. That's true because it wasn't given to Julie directly. It was given to Julie in trust for the college expenses of the kids. Dr. Cummings made the point of, I want to cash in, I've wasted all my money, I've given up my job, and I want to split the $130,000 in college funds. They have six children. There was $130,000 in Smith Barney College of Illinois Bright Start funds, earmarked for college, subject to the rules of the Bright Start program, and AJ wanted to cash them in and take half the money. Absolutely. Two minutes. Thank you. And the court said no. The court said, we're going to, and we asked, that that should be kept for the kids. At the bottom line, that was the whole issue in this case. Dr. Cummings wanted to stop being a father and stop supporting his kids, and we didn't want to do that. I'd like you to speak to this automatic increase in maintenance as the kids dropped off from the support obligation. Mr. Asbury may be correct. We proposed that because we wanted the court not to come back every two years. If you look at the age of the kids. Do you have the language in front of you? It does say as they're emancipated. It's not when the youngest one. In theory, it would be if child support was reduced from $5,000 every two weeks in next summer when the 17-year-old, if he filed a petition to modify and child support was reduced from 50% to 45% and it went from $5,000 to $4,500, it would automatically go, maintenance would be increased from $1,000 to $1,500. It would be as each one is emancipated. So that was the intention, and that's how the order is drafted. It doesn't wait until the youngest one. Okay. So I think there would be a change. I stand corrected. And I think it would be moved because of the de novo review of maintenance. We are going to be back in court next July. The oldest is 17. Next month, yeah. July of 2014. She'll be a senior in high school. Child support would potentially be modifiable next May, and the maintenance is automatically set to be a de novo review in July of 2014 because the court ordered two years. And I think the court did that because we had all these issues about him obtaining employment and the court wanted to get it denied my request for permanent maintenance, even though it was a 24-year marriage. And the court granted our imputation of income, and so the court said, okay, for two years we're going to do this. And then I think the court's intention was in two years we'll see. And since then, Dr. Cummings has gotten a job back as a doctor. So things will be different. It's a question of whether we'll continue to impute income or whether we'll use his new income because he's not an emergency room doctor. He's working for a health clinic. So at the end of the day, I think this really is a fact-driven case, and I think that Judge Galley took the facts that he had them, and I think he was in a position to judge the credibility of the parties, and he made a specific finding that Dr. Cummings pretty much did everything wrong for four and a half years, and he was his own worst enemy. I mean, we tried and tried and tried to get the case worked out, and at the end of the day the judge had the rule on everything, and this was the best we could come up with to protect Julie and the kids in this situation. If it is an automatic increase in maintenance, do you have an argument? I think that I would agree the statute requires a petition to be filed for child support to be modified, and I don't disagree with the argument that it's intended... We're talking about maintenance. Right, but maintenance under the automatic self-execution provision wouldn't change if he doesn't modify child support. It's only if child support goes down that maintenance would go up. So it's going to require him to first file a petition to modify child support, because right now child support won't modify from $5,000 every two weeks just because a child turns 18. He still is going to have to file a petition to modify. You're saying it's smooth. I'm saying it's not right until that happens. And I think we'll have to look at the terminology. And I think you're probably correct, Your Honor, that it wouldn't even be right until next May of 2014 will be when the oldest child... And then, Judge, it still wouldn't be right. I think you're out of time because of our questions. I'm sorry. Thank you. Thank you. Mr. Asbury? Thank you, Your Honor. Your Honor, Mr. Murphy is correct in asserting that this is essentially, particularly on the first issue, an issue of fact. I agree on the case law. I agree that there's a range, a great deal of discretion imparted to the court, that the numbers can vary depending on each circumstance. You take it on an ad hoc basis, look at the circumstances and the facts. And I think I did cite a case where it was similar facts, and it was a doctor, a longstanding wife, had custody of children. She had to support obligations, was of modest means, and it gave an award of a percentage. But the facts of this case, and again it goes back, and I would really implore the court, I'm sure as it will, review this chart. I just looked at it as counsel was speaking, and again his brief doesn't really address it. But when you look at the dissipation of the $106,000, not the dissipation, but the money used for these expenses, then you fast forward to the $258,000 reduced to $167,000, which was done apparently that same month of that year, and there's no explanation as to what that was used for, almost as if that reduction just disappears into the ether. It's not accounted for. These are simple numbers you can sit down. There's awards in here where Julie's awarded, I think, an account, and rather than put, it wasn't a lot, it was $2,000 or $3,000, but rather than put the account over and put the number under her ledger, it just says her name. It's not factored into the math. My brief, when you look at it, and there can be adjustments made. When you look at the debts, if something should be reduced, and if it's anything, I'll concede it's perhaps the $106,000, but I would ask the court to give scrutiny in looking at the debts because I think they're double awards here. She's given credit for those same debts later on in the same paper. But even reducing that, this is an extreme disparity in awards, not even close to the $5,446,000. If you just add up the property, she's starting off with, without getting all the retirement accounts, all the property other than the gold and diamonds, she's starting off with like $470,000. And what was the amount of debt she got? The amount of debt she got was actually less than his. She got, I believe it was somewhere around $55,000, he got $67,000. The debt she had paid was already taken out of the asset when she was awarded it. So you can't, if you take the $106,000 out and say it's not an asset, you then can't come back later and add it as a debt because that's a $212,000 award. What I'm saying is this is misleading and it really has to be looked at carefully because you will see, and his brief does not directly address the math in my brief. His brief talks about he's a bad guy, he's unsympathetic, don't like him. And that may be true to an extent, but this is in the system of jurisprudence we have to use, and as an emotional process as possible, use reason, sound reason, logic, and review these. And you'll see, I think, when you look at my brief and the mathematics and those employed by him, I'm correct, perhaps a few adjustments as far as some of the crediting and some of the debts. But when you look at his brief, it doesn't address directly head-on the thrust of this appeal, and that is that the mathematics is incorrect. If you just add up the leisure columns, even accepting it as he accepts it, it doesn't add up to that number. So I would submit and ask the Court to review that carefully. It is fact-based. We both agree on that. Mr. Murphy did an excellent job, perhaps too good a job at the trial level. He was awarded everything he asked in this document, including things that are inconsistent. Except for maintenance, lifetime maintenance. Well, yeah, permanent maintenance that's reviewable. The other thing I would just quickly bring up with regard to the new improvements in that regarding some property I think he mentioned about that would show that somehow we can infer diamonds or something were in his possession that he somehow had a pawn shop. I don't recall, and again, it's a record issue, but I don't recall evidence being put on about all these extravagant improvements he's made to this barn. In fact, one of the things that was argued, I think, was the children really shouldn't be visiting with him there because it's so primitive. There should be no overnights. So again, we have this argument of convenience when it's convenient for us. Visitation custody, he's not saying he's not emotionally stable. Financial issues, he's the best ER doc in Illinois. They're inconsistent, just as the judgment in this case is full of inconsistencies. The judgment is internally inconsistent. The mathematics involved are inconsistent. So I would ask the court respectfully to reverse and remand for a new trial, given all the inconsistencies and error that occurred. Thank you. Thank you. We will be taking the matter under advisement and running a decision after we all do our mathematical homework in this case. I do want to commend both attorneys on the civility here in the courtroom today. It was a pleasure to have both of you argue in front of us. Thank you for having me.